J-S26013-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: B.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: LUZERNE COUNTY CHILDREN AND YOUTH SERVICES | No. 604 MDA 2021 |

Appeal from the Decree Entered April 1, 2021
In the Court of Common Pleas of Luzerne County
Orphans' Court at No.: A-9089

BEFORE:  STABILE, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.:                    **FILED: SEPTEMBER 9, 2021**

Appellant Luzerne County Children and Youth Services ("CYS") appeals from the decree entered on April 1, 2021 in the Court of Common Pleas of Luzerne County ("orphans' court"), granting M.J.D.'s ("Father's") motion to dismiss CYS's petition to terminate involuntarily the parental rights of Father to his daughter, B.D. ("Child"), born in May 2018 and denying the petition. Upon review, we affirm.

We glean the facts and procedural history of this case from the certified record.  On November 3, 2020, CYS filed a petition to terminate Father's parental rights to Child involuntarily pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (2).  The orphans' court appointed Maria Turetsky, Esquire, as legal counsel and guardian *ad litem* for Child.  On January 14, 2021, the orphans' court conducted a hearing, at which CYS offered the testimony of Tammy

Purpura, a CYS caseworker and Gina Bellanca, CYS casework supervisor. Ms. Purpura testified that she has been involved with Child's case since 2018. N.T. Hearing, 1/14/21, at 7. She stated that from the beginning of Child's case until December 19, 2018, Father was subject to a protection from abuse ("PFA") order, which prohibited him from having any contact with Mother and Child. *Id.* at 14, 39. Nineteen days following the expiration of the PFA order, on January 7, 2019, Child was adjudicated dependent and placed into CYS's custody because of "[p]arental substance abuse, domestic violence between the natural parents, and mental health issues." *Id.* at 8. According to Ms. Purpura, at the time Child was adjudicated dependent, Father was not considered a resource because he was residing at "Just Believe Sober Living Facility," *id.* at 8-9, but was directed to engage in services and work toward reunification with Child. *Id.* at 9. In particular, "[h]e was ordered for eight hours of supervised visits at [CYS] or Vision Quest, remain sober, random urinalysis, safe and stable housing, and parenting services at his discretion." *Id.* at 9. According to Ms. Purpura, Father also was under house arrest until February 2020. *Id.* at 14, 16.

Ms. Purpura further testified that custody of Child was returned to her biological mother, T.L.L ("Mother") on July 19, 2019, following a permanency review hearing. *Id.* Father, however, still was not considered a resource and "ordered to engage in anger management and continue with his visitation." *Id.* at 10. He did not have safe and stable housing, because he was residing at the sober facility. *Id.* According to Ms. Purpura, CYS regained custody of

Child on January 9, 2020, because Mother relapsed into substance abuse and "lost her housing." *Id.* Even at this point, Father was not considered a resource, as he was residing at the sober facility. *Id.* CYS placed Child with maternal grandmother ("Grandmother"). *Id.* at 11.

Ms. Purpura testified that, following Mother's death, Father's schedule for visitation with Child was "[e]ight hours supervised by [CYS] or Vision Quest." *Id.* In addition, Grandmother also was permitted to supervise Father's visits and visitations were permitted to occur at Grandmother's residence. *Id.* at 11, 18. However, because of the COVID-19 pandemic, Father's visitation schedule was modified in March 2020. *Id.* at 18-19. Specifically, Father was permitted two video calls with Child per week, each lasting at least fifteen minutes. *Id.* at 19.

Ms. Purpura recalled that, since Child's dependency adjudication, Father had not been consistent in his visitations. *Id.* at 11. According to Ms. Purpura, Father visited with Child only four times in person prior to CYS's filing of the termination petition. *Id.* Furthermore, she testified that Father made only five video calls with Child prior to CYS's filing of the termination petition (and two more since then). *Id.* at 19. Ms. Purpura recalled that Father's last in-person visit with Child occurred on July 6, 2020 and his last video call on July 18, 2020. *Id.* at 18-19.

When asked whether Father—in the six months prior CYS's filing of the termination petition—provided "any necessities, clothing, or anything" for Child, *id.* at 20, Ms. Purpura answered "[h]e did show up for an in person visit

on June 30 at [Grandmother's] home and he brought some gifts and toys in the form of toys[.]" **Id.** According to Ms. Purpura, that was the only time prior to the filing of the November 3, 2020 termination petition when Father provided anything for Child. **Id.**

Ms. Purpura testified that, other than being inconsistent in his visitations with Child, Father was compliant with his court-ordered services. **Id.** She further testified that Father was deemed in "substantial" compliance at the last permanency review in October 2020. **Id.** at 20-21. Ms. Purpura also testified that Father never evinced an intention to assume full custody of Child. **Id.** at 21. She recalled that Father wanted Child to remain with Grandmother, but "would like to be able to visit and take her out." **Id.** at 22.

On cross-examination, Ms. Purpura acknowledged that CYS indicated at the October 19, 2020 permanency review hearing that it would not be filing a termination petition against Father because he "has been engaged with [CYS] and services, and is in the process of securing safe and stable housing."[1] **Id.** at 25. Ms. Purpura further acknowledged that the permanency review hearing

---

[1] On October 27, 2020, the juvenile court adopted the hearing master's October 19, 2020 permanency review recommendations in this case. In particular, the court noted:

> [CYS] does not intend to file or join a petition to terminate parental rights because a compelling reason has been documented by [CYS] that filing a petition to terminate parental rights would not serve the needs and welfare of [Child], to wit: [Father] has been engaged with [CYS] and services and is in the process of securing safe and stable housing.

Permanency Review Recommendation, 10/19/20, at 2.

- 4 -

occurred approximately two weeks prior to CYS's filing of the termination petition. *Id.* at 25-26. When asked why CYS proceeded with termination, Ms. Purpura answered that the master's recommendation that CYS would not be filing a termination petition was incorrect. *Id.* at 26. She then conceded that no one from CYS attempted to correct or modify the master's recommendation. *Id.* Ms. Purpura also conceded that CYS was only concerned with Father's lack of safe and stable housing at the October 2020 permanency review hearing. *Id.* She testified that, despite intending to file a termination petition, CYS asked Father to complete parenting education and to continue with his visitations. *Id.* When asked why, Ms. Purpura answered that Father did not have a bond with Child, although she later admitted that she never actually witnessed Father's interactions with Child and did not know the nature of their bond. *Id.* at 27, 40, 42. Ms. Purpura acknowledged that CYS considered Mother to be Child's primary resource from July 19, 2019 until January 5, 2020 and that CYS's focused shifted to Father only after Mother's death in February of 2020. *Id.* at 27. Ms. Purpura also acknowledged that CYS did not request that a court direct Father to complete parenting classes at the first permanency review hearing following Mother's death. *Id.* at 27-28. According to Ms. Purpura, Father was directed to complete parenting classes at the October 2020 permanency review hearing and he started taking the classes at Concern only after CYS filed the termination petition. *Id.* at 36-27.

Moreover, Ms. Purpura readily conceded that the relationship between Father and Grandmother was bad. *Id.* at 29. Ms. Purpura acknowledged that Grandmother blamed Father for Mother's death, complained to CYS that Father had not attempted to contact Child since 2020, and made a referral to CYS against Father so that he would never be allowed around Child. *Id.* at 30. Specifically, Grandmother accused Father of child pornography in July and August 2020. *Id.* at 31, 49. Ms. Purpura admitted that given the relationship between Father and Grandmother, it was understandable that Father would "be reluctant to be overheard by or observed by" Grandmother. *Id.* at 32. In fact, even though Father was invited to have his supervised visits with Child at CYS office or Vision Quest, he declined the invitation and chose to be supervised by Grandmother. *Id.* at 39. Ms. Purpura testified that Father was "happy with [Grandmother] to continue supervising his visits" and that he "did not ask for a change in who supervised the visits" until after CYS filed the termination petition. *Id.* at 39-40.

Ms. Purpura clarified that Father was in substantial compliance at the May 13, 2020 permanency review hearing, but only in minimal compliance at the October 19, 2020 hearing. *Id.* at 32-34. She admitted that Father secured safe and stable housing on November 1, 2020, a few days prior to CYS's filing of the termination petition, complying with the October 2020 permanency review recommendations. *Id.* at 34, 38.

CYS next presented the testimony of Ms. Bellanca, who testified that CYS chose to file the termination petition against Father because CYS was concerned that

> [T]hroughout the case [Father] never stepped forward to actually take custody of [Child] or be involved as a parent. He had very limited contact with her throughout the life of the case. And even during the first period of time that she was in care, he had stated he wanted custody to go to [Mother] . . . and he didn't care to take on that role as a full-time parent.

*Id.* at 43-44. Ms. Bellanca, however, remarked that Father generally was cooperative with CYS and kept in contact. *Id.* at 44. Additionally, she remarked that CYS was not concerned with Father's engagement with services because he "had been cooperative with services." *Id.* According to Ms. Bellanca, Father wanted Child to reside with Grandmother and for Grandmother to have primary physical and shared legal custody of Child. *Id.* at 45-46. However, Ms. Bellanca testified that Grandmother wanted to adopt Child and did not want to share custody with Father. *Id.* at 46.

On cross-examination, Ms. Bellanca acknowledged that Grandmother accused Father of child pornography towards the end of summer and that, following an investigation, those accusations were determined to be unfounded. *Id.* at 49. Yet, despite the accusations being unfounded, according to Ms. Bellanca, Grandmother continues to believe "just because there wasn't enough evidence to have it be indicated, she still believes the allegations are true." *Id.*

On February 18, 2021, Father moved to dismiss CYS's termination petition. On February 19, 2021, GAL filed a letter brief opposing Father's motion to dismiss. On the same day, CYS also filed a brief opposing the motion to dismiss. On April 1, 2021, the orphans' court granted Father's motion to dismiss and denied CYS's termination petition under Section 2511(a)(1) and (2).[2] CYS timely appealed. Both CYS and the orphans' court complied with Pa.R.A.P. 1925.

On appeal, CYS presents a single issue for our review.

[I.] WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT CHILDREN AND YOUTH DID NOT MEET ITS BURDEN UNDER 23 PA. C.S.A. §§ 2511(A)(1) AND (2) TO OVERCOME NATURAL FATHER'S MOTION TO DISMISS, AS THE CLEAR AND CONVINCING EVIDENCE PRESENTED ESTABLISHED THAT THE MINOR CHILD HAS BEEN DEPENDENT SINCE JANUARY OF 2019, THE NATURAL FATHER HAS MADE NO SIGNIFICANT EFFORT TO MAINTAIN CONTACT WITH THE MINOR CHILD OR PERFORM PARENTAL DUTIES FOR THE MINOR CHILD AND THROUGH THE NATURAL FATHER'S ACTIONS AND STATEMENTS HAS EVIDENCED NO DESIRE OR INTENT TO EXERCISE ANY SIGNIFICANT PARENTAL CARE OR PERFORM PARENTAL DUTIES FOR THE MINOR CHILD IN THE FUTURE.

CYS Brief at 6 (capitalization in original).

When we review an orphans' court's decision to grant or deny a petition to involuntary terminate parental rights, we must accept the findings of fact

---

[2] Because the orphans' court denied CYS's termination petition under subsection (a), it declined to address subsection (b), the needs-and-welfare analysis. *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) ("Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b)[.]").

and credibility determinations of the orphans' court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the [orphans'] court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the orphans' courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he [orphans'] court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d at 511.

- 9 -

In this case, the orphans' court denied CYS's petition to terminate Father's parental rights to Child pursuant to subsection 2511(a)(1) and (2), which provide:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(1), (2).

We first address CYS's claim that the orphans' court abused its discretion in denying the termination petition under subsection (a)(1). In this regard, CYS argues that Father failed to perform parental duties during the six months preceding the filing of the termination petition.

With regard to Section 2511(a)(1), this Court has observed:

> To meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and

- 10 -

child" before moving on to analyze Section 2511(b). *Id*. (quoting *In re Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88, 92 (1998)).

This Court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, [] 859 A.2d 767 (2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id*. (citation omitted).

*In re J.T.M.*, 193 A.3d 403, 409 (Pa. Super. 2018).

Instantly, upon our review of the record and the relevant case law, we conclude that the orphans' court accurately and thoroughly addressed the merits of CYS's argument under subsection (a)(1). Orphans' Court Opinion, 5/27/21, at 6-11. CYS failed to establish that Father refused to perform parental duties during the *six months preceding* the filing of the termination petition on November 3, 2020. The evidence established that Father not only remained in contact with Child until at least July 18, 2020, but also brought her gifts on June 30, 2020. As a result, Father did not fail to perform parental duties "for a period of at least six months." Additionally, the court found that, even though Father's visitations were sporadic, the COVID-19 pandemic pervaded from March 2020 up until, and continuing after, the filing of the termination petition in November 2020 and, as a result, affected Father's visitations with Child. *Id.* at 7, 9. The court reasoned:

> The COVID-19, pandemic took [a] toll on the entire world in 2020 at which point only necessary trips outside of the, home was strongly recommended. The [c]ourt will take notice that the pandemic occurred throughout the majority of the child's dependency. Father's visits with [C]hild did not remain, "in person" but had to continue by video. Due to the young age of [C]hild at two (2) years old, it was difficult for Father to interact with [C]hild on video. According to Ms. Bellanca, over a period of one month, Father was not satisfied with the video calls with [C]hild while she was in the [G]randmother's residence. Ms. Bellanca stated that [C]hild was not participating in the video. [CYS] had to advise [G]randmother to assist [C]hild in participating in the video call with her Father. Thus, this [c]ourt must consider the barrier of Covid-19 restrictions as it relates to video conference visitation rather than having an "in person" visit with a child of such a young age. . . . But for the Covid-19 restrictions discouraging "in person" contact during the majority of the case, and this [c]ourt's global order restricting in-person visitation between households, Father could have had more "in person" contact with his daughter prior to the filing of the petition to terminate Father's parental rights. Had [C]hild been older and more mature in interacting with Father on video, video calls as a means of contact would most probably not have been an issue.

*Id.* at 9-10. Moreover, the orphans' court considered Father's relationship with Grandmother and specifically deemed her unfounded accusations of child pornography against him as a reason for Father's hesitation to visit Child during the late summer months. *Id.* at 7-8. Accordingly, the orphans' court did not abuse its discretion in granting Father's motion to dismiss and denying CYS termination petition under subsection (a)(1).

We now address CYS's contention under subsection (a)(2). We have explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect

- 12 -

or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*,[3] 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further, the grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

Here, as with (a)(1), we conclude that the orphans' court accurately and thoroughly addressed the merits of Appellant's argument under subsection (a)(2). Orphans' Court Opinion, 5/27/21, at 12-15. The orphans' court reasoned:

_____

[3] Although not relevant to the disposition of this appeal, the Supreme Court recently overruled on other grounds *A.L.D.* in *In re S.K.L.R.*, __ A.3d __, 2021 WL 3624786 at *12 (Pa. filed August 17, 2021).

In the case at bar, the evidence adduced at trial does not support the contention that Father has displayed a repeated and continued incapacity to perform parental duties for [Child]. The conditions which gave rise to placement were parental substance abuse, domestic violence between natural parents and mental health issues. Father was ordered to remain sober, submit to random urinalysis, maintain or obtain safe and stable housing and complete parenting services of his own choice.

On cross examination, Ms. Purpura testified that a May 13, 2020 [p]ermanency [o]rder indicates that Father was in substantial compliance with his court ordered services. Ms. Purpura further admitted that at the time of the filing of the petition to terminate parental rights, the only thing that [CYS] was concerned with was Father's ability to obtain safe and stable housing. Indeed, Father did secure same on November 1, 2020 prior to the filing of the petition to terminate his parental rights. Ms. Purpura testified that she had the opportunity to observe Father's home and inspect it and found it to be an appropriate placement for [C]hild. Ms. Purpura stated the Father was also ordered to attend parenting education courses and to continue with his visits. Ms. Purpura testified that Father began engaging in parenting services with a provider named "Concern." Ms. Bellanca also testified that Father was cooperative with the services. Based upon the testimony of the caseworker and casework supervisor, Father had remedied his issues which led [Child] to placement. Based on the lack of evidence presented by [CYS], the [c]ourt does not find that [CYS] presented clear and convincing evidence that the conditions which led to the removal or placement of [Child] continue to exist with respect to Father or that he has not remedied any incapacity within a reasonable amount of time.

*Id.* at 12-13 (record citation omitted).[4] Accordingly, in light of the evidence adduced at the termination hearing, the orphans' court did not abuse its

---

[4] The orphans' court also found that CYS failed to offer a reasonable explanation why it decided to file a termination petition on November 3, 2020 after explicitly representing to the hearing officer at the October 19, 2020 permanency review hearing that it would not be doing so. Orphans' Court Opinion, 5/27/21, at 14. The court found that it "is appalled that [CYS] would explicitly represent to the Hearing Officer that [CYS] would not be filing a

*(Footnote Continued Next Page)*

- 14 -

discretion in granting Father's motion to dismiss and denying CYS relief under subsection (a)(2). We, therefore, affirm the orphans' court's April 1, 2020 decree. We further direct that a copy of the orphans' court's May 21, 2021 opinion be attached to any future filings in this case.

Decree affirmed.


Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/09/2021

_____

petition to terminate Father's parental rights due to Father engaging in services and securing adequate housing and then proceed to file a petition to the contrary two weeks thereafter." *Id.* The orphans' court further found:

> The Hearing Officer's recommendation based on [CYS's] representation was adopted as a court Order. A court [o]rder is entered for a reason. Parties present their positions in [c]ourt and after a hearing a court [o]rder is entered. A court order is not to be taken lightly and disregarded without cause. Had [CYS] believed that the [o]rder was entered by mistake, the agency needed to immediately file a petition to modify the [c]ourt Order and not file a petition to the contrary as if the court [o]rder never existed.

*Id.* at 14.

IN THE INTEREST OF    :    IN THE COURT OF COMMON PLEAS
                           :    OF LUZERNE COUNTY

B.D.                    :

                           :    ORPHAN'S COURT DIVISION

A Minor               :

                           :    Adoption No. A-9089

                           :    604 MDA 2021

RECORDED
05/27/2021 10:59:45 AM
JUDICIAL SERVICES & RECORDS
LUZERNE COUNTY
PENNSYLVANIA
Inst Num:      202133614

## MEMORANDUM ISSUED PURSUANT TO PA. R.A.P. 1925 (a)

### I.   PROCEDURAL HISTORY

Petitioner, Luzerne County Children and Youth Services, (Children and Youth) filed a Petition for the Involuntary Termination of Parental Rights of the Father as to the minor child, B.D. on November 3, 2020. The natural mother of the child passed away in February of 2020.

A hearing was held on January 14, 2021 concerning the proposed termination of Father's parental rights. At the conclusion of Children and Youth's case in chief on grounds only, Father's counsel made a Motion to dismiss Children and Youth's petition stating that Children and Youth did not meet its burden by clear and convincing evidence to satisfy the requirements of Title 23 Pa.C.S. 2511 (a)(1) & (2). The Court directed both parties so submit a brief in support of their respective positions subsequent to the receipt of the transcript of the hearing. On April 1, 2021, this Court entered an Order granting Father's petition to dismiss the petition to involuntarily terminate his parental rights. On April 29, 2021, Petitioner filed a Notice of Appeal to the Superior Court. Petitioner's Statement of Matters Complained of on Appeal is as follows:

1. The Court erred in determining that Children and Youth did not meet its

    burden under 23 Pa.C.S.A. 2511 (a) (1) & (2) to overcome Natural Father's

1

motion to dismiss, as the clear and convincing evidence presented established that the minor child has been dependent since January of 2019, the natural father has made no significant efforts to maintain contact with the minor child or perform parental duties for the minor child and through the natural father's actions and statements has evidenced no desire or intent to exercise any significant parental care or perform parental duties for the minor child in the future.

2. The Court erred in giving more weight to the compelling reason as to why a petition to terminate parental rights was not filed at the October 2020 permanency review hearing than to the testimony and evidence presented at the January 14, 2021 hearing on Children and Youth's petition to terminate parental rights which established that the minor child has been dependent since January of 2019, the natural father has made no significant effort to maintain contact with the minor child or perform parental duties for the minor child and through the natural father's actions and statements has evidenced no desire or intent to exercise any significant parental care or perform parental duties for the minor child in the future.

3. The Court erred in its reasoning for granting Natural Father's motion to dismiss Children and Youth's petition to terminate parental rights by reasoning that the minor child has not been in placement fifteen (15) out of the last twenty-two (22) months at the time of the October 2020 permanency review. The minor child was initially placed in the custody of Children and Youth on January 7, 2019. The minor child was returned to the custody of the natural mother on July 19, 2019 and remained with the natural mother until

2

the minor child was re-placed in the custody of Children and Youth on January 9, 2020 where the child remained at the time of permanency review on October 19, 2020 and until present day. Therefore, at the time of the permanency review, excluding the time the minor child was returned to the natural mother, the minor child was in placement for a total of fifteen (15) out of the last twenty-two (22) months.

4. The Court erred in determining that the minor child's best interest would be met by granting natural father's motion to dismiss Children and Youth's petition to terminate parental rights, as the natural father has evidenced no intent to have the minor child returned to his custody and the maternal grandmother has stated her intention would be to adopt the minor child and not a custody arrangement.

## II. FINDINGS OF FACT

There is one minor child in this case, B.D. who was born on May 29, 2018. N.T. 1/14/21 at 8. This case involves the proposed termination of Father's parental rights. The minor child, B.D. was initially placed on January 7, 2019. The minor child, B.D., was adjudicated dependent and placed in the custody of Children and Youth on January 7, 2019. The reasons for placement were parental substance abuse, domestic violence between the natural parents and mental health issues. N.T. 1/14/21 at 7-8. Father was not a resource for the child because he was residing at a sober living facility at the time of the child's initial placement in January of 2019.

On July 19, 2019, six months subsequent to the child's adjudication of dependency and placement, the minor child was returned to the custody of the natural

3

mother. *Id.* at 9. Father was ordered to engage in anger management and continue with his visits with the minor child. During that time, Father was not considered a resource for the child since he was still residing at the sober living facility. *Id.* at 10.

However, on January 9, 2020, the child was returned to the custody of Children and Youth due to the natural mother relapsing and losing her housing. Father was not considered as a resource for the child in light of the fact that he still remained residing in the sober living facility. *Id.*

On October 27, 2020, following a permanency review hearing docketed to CP-40-DP-0000565-2018, the Court adopted the recommendation of the Juvenile Court Hearing officer entered on October 19, 2020 which states in pertinent part as follows:

> **NO PETITION FILED:** Although the child has been in placement for 15 of the last 22 months or will be in placement for such period consistent with the permanency plan developed for the child . . . **the Agency does not intend to file or join a petition to terminate parental rights because a compelling reason has been documented by the Agency that filing a petition to terminate parental rights would not serve the needs and welfare of the child, to wit: the Natural Father has been engaged with the Agency and services and is in the process of securing safe and stable housing.** (Emphasis added)

Obviously, the order resulting from the October 19, 2020 permanency hearing was based upon the testimony adduced at hearing. Despite the aforesaid, on November 3, 2020, two weeks after the hearing, Luzerne County Children and Youth filed a petition to terminate Father's parental rights.

III. **CONCLUSIONS OF LAW**

After consideration of the credible evidence as summarized above and more detailed below, the Court concludes that Children and Youth did not meet its burden by clear and convincing evidence as to why Father's rental rights to the minor

4

child, B.D., should be terminated pursuant to 23 Pa. C.S.A. Section 2511(a)(1) and 23 Pa.C.S.A. Section 2511 (a)(2).

## IV.   DISCUSSION

There was insufficient evidence presented at trial to establish grounds for termination under 23 Pa.C.S.A. §2511 (a)(1). Children and Youth's first alleged error and fourth alleged error address the issues related to 23 Pa.C.S.A.§2511 (a)(1). The alleged errors are as follows:

1. The Court erred in determining that Children and Youth did not meet its burden under 23 Pa.C.S.A. 2511 (a) (1) & (2) to overcome Natural Father's motion to dismiss, as the clear and convincing evidence presented established that the minor child has been dependent since January of 2019, the natural father has made no significant efforts to maintain contact with the minor child or perform parental duties for the minor child and through the natural father's actions and statements has evidenced no desire or intent to exercise any significant parental care or perform parental duties for the minor child in the future;

4. The Court erred in determining that the minor child's best interest would be met by granting natural father's motion to dismiss Children and Youth's petition to terminate parental rights, as the natural father has evidenced no intent to have the minor child returned to his custody and the maternal grandmother has stated her intention would be to adopt the minor child and not a custody arrangement.

Termination of parental rights is an issue of constitutional dimensions because of the fundamental right of an individual to raise his or her own child. Therefore, in proceedings terminating parental rights, the Petitioner must prove by clear and convincing evidence that the statutory criteria have been met. *Santosky v. Kramer*,

5

455 U.S. 745 (1982), **In Re: T.R.**, 502 Pa. 165, 465 A.2d 642 (1983). However, as the Pennsylvania Supreme Court has stated "a parent's basic constitutional right to custody and rearing of his or her child is converted upon the failure to fulfill his or her parental duties to the child's right to have proper parenting in fulfillment of his or her potential in a permanent, healthy, safe environment." **In Re: J.A.S., Jr.**, 2003 Pa. Super. 112, (**citing In the interest of Lillie**, 719 A.2d 327 (Pa. Super 1998))

In **In re Matsock**, 416 Pa. Super. 520, 611 A.2d 737, 747 (1992), the court addressed the significance of termination of parental rights as follows:

> In any context, the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the child[ren]. **In Re Adoption of Michael J.C.** 326 Pa. Super. 143, 152, 473 A.2d 1021, 1026(1984) (citation omitted), **reversed on other grounds**, 506 Pa. 517, 486 A.2d 371 (1984). "Because of the importance placed on the family unit, governmental intrusion into the family, and disruption of the parent-child relationship, is warranted only in exceptional circumstances."**Id.**, and "*only* upon a showing of *clear necessity*." **In the Interest of C.M.E.**, 301 Pa. Super. 579, 586, 448 A.2d 59, 63 (1982)(emphasis added). Even when such intrusion is necessary to protect the children, every possible effort must be made to reunite the family. **Michael J.C., supra; C.M.E., supra.**

A court may terminate parental rights under Section 2511(a)(1) when:

> The parent by conduct continuing for a period of at least six months immediately preceding the filing of the Petition has either evidenced a settled purpose of relinquishing parental claim to a child **OR** has refused or failed to perform parental duties. (emphasis added)

Ms. Tammy Purpura, a caseworker at Children and Youth, testified that between the date of placement of the minor child on January of 2019 and the date of filing of the Petition to Terminate Father's parental rights on November 3, 2020, Father had four (4) "in person" visits with the minor child and five (5) video calls with the minor child in light of Covid-19 restrictions. Father also had two video calls with the minor child

6

subsequent to the filing of the petition to terminate his parental rights. N.T. 1/14/21 at 11-12, 18-19. Mr. Purpura testified that Father's last "in person" visit with the minor child was July 6, 2020 and his last video call with the child was July 18, 2020. *Id.* at 7-8.

In March 2020, in light of Covid-19 visitation concerns, an order was entered permitting Father two video calls per week lasting at least fifteen (15) minutes per call. Ms. Purpura testified that on June 30, 2020, prior to the filing of the petition to terminate Father's parental rights and prior to the October 2020 permanency hearing, Father appeared at the maternal grandmother's residence bringing gifts and toys for the child. *Id.* at 20. Ms. Purpura testified that Father was compliant with the court ordered services although he was not consistent with his visits with the minor child. *Id.*

The natural Father's schedule for visits with the minor child was eight (8) hours per week supervised by Children and Youth representatives or representatives of a community based provider known as Vision Quest. The maternal grandmother was also able to supervise Father's visits with the minor child at that time. Ms. Purpura testified that Children and Youth expanded Father's visits with the minor child to permit the supervised visits to occur at the maternal grandmother's residence. Ms. Purpura indicated that B.D. has been placed with the maternal grandmother at all times other than the six months when the child remained dependent, but was in the custody of natural mother.

Furthermore, Ms. Purpura testified that shortly before the placement of the child in January 2019, there was a Protection from Abuse Order prohibiting Father from having contact with Mother and child which expired on December 19, 2018. According to Ms. Purpura, Father indicated that he was planning on setting up visits with the

7

minor child through the natural mother and the maternal grandmother after the expiration of the Protection from Abuse order. However, Mr. Purpura stated that Father did not reach out to set up the visits. *Id.* at 13-14. Notably, the period of time that elapsed between the expiration of the Protection from Abuse order and the adjudication of dependency wherein the child was removed from the custody of Mother was 19 days.

Ms. Purpura testified that the first time that Father had a visit with the minor child was in December 2019[1]. Mr. Purpura indicated the Father's reasons for not visiting consistently with the minor child was that Father was on "house arrest" until February 2020 and stated he would reach out to the natural mother. *Id.* at 12.

Ms. Purpura testified that Father was given the opportunity to have his supervised visits with his child at the Children and Youth office or at Vision Quest. However, Father did not take advantage of that opportunity and chose to be supervised by the maternal grandmother. *Id.* at 39. Ms. Purpura testified that Father did not ask for a change in supervisor until subsequent to the filing of the petition to terminate his parental rights. *Id.* at 40.

The Court took into consideration the maternal grandmother's feelings regarding Father. Ms. Purpura testified that the relationship between the maternal grandmother and the Father was not a good relationship. *Id.* at 29. On cross-examination, Ms. Purpura testified that the maternal grandmother reported to her that Father had not attempted to contact the child since July of 2020 and that she had made a referral to Children and Youth against Father so that he would never be allowed around the child.

---

[1] The court is mindful that Children & Youth did not have custody of B.D. the entire time between the initial date of placement on January 7, 2019 and Father's first visit with the child in December of 2019. After the initial placement on January 7, 2019, Children and Youth returned the child to the Mother for six (6) months from July 19, 2020 until January 9, 2020 when Mother relapsed due to drug abuse and loss of housing.

8

*Id.* at 30. Ms. Purpura further testified that the maternal grandmother indicated to her that she believed Father was responsible for the death of the natural mother, her daughter, and believed Father was involved in child pornography. However, Ms. Gina Bellanca, casework supervisor at Luzerne County Children Youth Services, testified that the allegations against Father regarding child pornography were investigated by the Lackawanna County Department of Children, Youth and Families and was determined to be unfounded. *Id.* at 49.

On cross examination, Ms. Purpura was questioned as to whether it was appropriate for Children and Youth to coordinate visits between Father and the maternal grandmother considering the maternal grandmother's poor relationship with Father. *Id.* at 31. Ms. Purpura admitted on cross examination that she understood the reason Father would be reluctant to be supervised by the maternal grandmother in light of her accusations of Father being involved in child pornography, in addition to her belief that he was responsible for the death of the mother. *Id.* at 31-32.

This Court further took into consideration the barriers which hindered Father from having "in person" contact with her child. The Covid-19 pandemic took a toll on the entire world in 2020 at which point only necessary trips outside of the home was strongly recommended. The Court will take notice that the pandemic occurred throughout the majority of the child's dependency. Father's visits with the child did not remain, "in person" but had to continue by video. Due to the young age of the child at two (2) years old, it was difficult for Father to interact with the child on video. According to Ms. Bellanca, over a period of one month, Father was not satisfied with the video calls with the child while she was in the maternal grandmother's residence. Ms. Bellanca stated that the child was not participating in the video. Children and Youth had to advise

9

the maternal grandmother to assist the child in participating in the video call with her Father. Thus, this Court must consider the barrier of Covid-19 restrictions as it relates to video conference visitation rather than having an "in person" visit with a child of such a young age. *In Re E.S.M.*, 622 A.2d 388, 393 (Pa. Super. 1993); *In Re M.S.*, 664 A.2d 1370 (Pa. Super. 1995); *In Re I.J.*, 972 A.2d 5 (Pa. Super. 2009)) But for the Covid-19 restrictions discouraging "in person" contact during the majority of the case, and this Court's global order restricting in-person visitation between households, Father could have had more "in person" contact with his daughter prior to the filing of the petition to terminate Father's parental rights. Had the child been older and more mature in interacting with Father on video, video calls as a means of contact would most probably not have been an issue.

In the case at bar, this Court relies upon supporting case law, which directs the Court not to mechanically apply the statutory six-month requirement in forfeiting Father's parental rights. The Court considered the history of the case. The Court carefully examined Father's circumstances and actions to determine that the evidence presented and the explanations given by Father, in light of the totality of circumstances, do not clearly and convincingly warrant the involuntary termination of his parental rights. *In re D.J.S.*, 737 A.2d 283 (Pa. Super. 1999)

Ms. Purpura testified that the minor child has no bond with the child, yet she testified that she has not observed the child in person or virtually with the natural Father throughout the case. *Id.* at 40. Ms. Purpura was questioned on cross examination as to how she could make a conclusion as to the Father having no bond with the child if she had never seen the child in the presence of the Father. Ms. Purpura responded, "I don't know ". *Id.* at 42.

10

Ms. Purpura testified that throughout the life of the case, Father did not maintain the position that he wanted primary physical custody of the child. Father has indicated that he preferred for the maternal grandmother to continue having primary physical custody of the child and that he would like to continue having visits with the child and taking the child out on occasions. *Id.* 21-22. The Court, however, also recognizes the significant difference between a party seeking primary physical custody and a party seeking to terminate parental rights of another. Although testimony reflects that Father preferred that the maternal grandmother maintain primary physical custody of the minor child, Father is not proposing that he no longer have any contact with the minor child by having his parental rights terminated. Had Father wished for his parental rights to be terminated, he would have voluntarily consented to the same. Ms. Bellanca testified that the maternal grandmother did not wish to have a custody arrangement with Father. She wanted to adopt the child and be a sole parent. *Id.* at 46.

This Court finds that the Petitioner failed to satisfy the requirements of Title 23, Pa. C.S. §2511 (a)(1) by clear and convincing evidence. Thus, the Petitioner failed to meet its required burden to establish that Father has evidenced a settled purpose of relinquishing parental claim to his child or has refused or failed to perform parental duties at least six (6) months prior to the filing of the petition to terminate Father's parental rights. The Court finds that the Petitioner did not present testimony or evidence that is clear, direct and convincing so as to enable the Court to come to a clear conviction, without hesitance, of the truth of the facts in issue in order to satisfy meeting the standard of "clear and convincing evidence". *In re D.J.S.*, 737 A.2d 283 (Pa. Super. 1999). In a matter of this magnitude, this Court is compelled to require that this statutorily imposed burden is appropriately met.

11

## A. 23 Pa. C.S.A. Section 2511 (a)(2)

Children and Youth's second alleged error addresses the issue related to 23 Pa.C.S.A.§2511 (a)(2). The alleged error is as follows:

2. The Court erred in giving more weight to the compelling reason as to why a petition to terminate parental rights was not filed at the October 2020 permanency review hearing than to the testimony and evidence presented at the January 14, 2021 hearing on Children and Youth's petition to terminate parental rights which established that the minor child has been dependent since January of 2019, the natural father has made no significant effort to maintain contact with the minor child or perform parental duties for the minor child and through the natural father's actions and statements has evidenced no desire or intent to exercise any significant parental care or perform parental duties for the minor child in the future.

A Court may terminate parental rights under Section 2511(a)(2) when:

The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

In the case at bar, the evidence adduced at trial does not support the contention that Father has displayed a repeated and continued incapacity to perform parental duties for his child, B.D. The conditions which gave rise to placement were parental substance abuse, domestic violence between natural parents and mental health issues. Father was ordered to remain sober, submit to random urinalysis, maintain or obtain

12

safe and stable housing and complete parenting services of his own choice. N.T. 1/14/21 at 9.

On cross examination, Ms. Purpura testified that a May 13, 2020 Permanency Order indicates that Father was in substantial compliance with his court ordered services. Ms. Purpura further admitted that at the time of the filing of the petition to terminate parental rights, the only thing that Children and Youth was concerned with was Father's ability to obtain safe and stable housing. Indeed, Father did secure same on November 1, 2020 prior to the filing of the petition to terminate his parental rights. *Id.* at 34. Ms. Purpura testified that she had the opportunity to observe Father's home and inspect it and found it to be an appropriate placement for the child. *Id.* at 38. Ms. Purpura stated the Father was also ordered to attend parenting education courses and to continue with his visits. *Id.* at 26. Ms. Purpura testified that Father began engaging in parenting services with a provider named "Concern". Ms. Bellanca also testified that Father was cooperative with the services. *Id.* at 43-44. Based upon the testimony of the caseworker and casework supervisor, Father had remedied his issues which led the child to placement. Based on the lack of evidence presented by Children and Youth, the Court does not find that Children and Youth presented clear and convincing evidence that the conditions which led to the removal or placement of B.D. continue to exist with respect to the Father or that he has not remedied any incapacity within a reasonable amount of time.

Ms. Purpura was questioned regarding the October 19, 2020 Permanency Order which stated that Children and Youth will not be filing a petition to terminate Father's parental rights due to Father being engaged with the agency and services, in addition to the Father being in the process of securing safe and stable housing. *Id.* at 25. The court

13

notes that this permanency order was entered approximately two weeks prior to the November 3, 2020 petition to terminate Father's parental rights. *Id.* The court also notes that permanency orders in Luzerne County are prepared by Children and Youth staff for the Hearing Officer's and Judge's signature following a permanency hearing before the Hearing Officer, as was the case in this matter.

When questioned on cross-examination what materially changed between October 19, 2020 and November 3, 2020 for the petition to terminate Father's parental rights to be filed, Ms. Purpura's only explanation was that the Order was "incorrect". Despite Ms. Purpura's position that the order is incorrect, Children and Youth did not file a petition to modify or correct the permanency order prior to trial. Children and Youth instead went ahead and filed a petition to terminate Father's parental rights as if the Permanency Order never existed. This court is appalled that Children and Youth would explicitly represent to the Hearing Officer that the agency would not be filing a petition to terminate Father's parental rights due to Father engaging in services and securing adequate housing and then proceed to file a petition to the contrary two weeks thereafter.

The Hearing Officer's recommendation based on Children and Youth's representation was adopted as a court Order. A court Order is entered for a reason. Parties present their positions in Court and after a hearing a court Order is entered. A court order is not to be taken lightly and disregarded without cause. Had Children and Youth believed that the Order was entered by mistake, the agency needed to immediately file a Petition to modify the Court Order and not file a petition to the contrary as if the court Order never existed.

14

Based upon the testimony of Children and Youth's own witnesses in confirming that Father completed his services to remedy the conditions which led to the placement of the child, the Court finds that the Petitioner did not present evidence that is clear, direct and convincing so as to enable the Court to come to a clear conviction, without hesitance, of the truth of the facts in issue in order to satisfy meeting the standard of "clear and convincing evidence". *In re D.J.S.*, 737 A.2d 283 (Pa. Super. 1999).

## V. ADOPTION AND SAFE FAMILIES ACT (ASFA) CONSIDERATIONS

Children and Youth's third alleged error addresses the issue related to the Adoption and Safe Families Act ("ASFA"). The alleged error is as follows:

3. The Court erred in its reasoning for granting Natural Father's motion to dismiss Children and Youth's petition to terminate parental rights by reasoning that the minor child has not been in placement fifteen (15) out of the last twenty-two (22) months at the time of the October 2020 permanency review. The minor child was initially placed in the custody of Children and Youth on January 7, 2019. The minor child was returned to the custody of the natural mother on July 19, 2019 and remained with the natural mother until the minor child was re-placed in the custody of Children and Youth on January 9, 2020 where the child remained at the time of permanency review on October 19, 2020 and until present day. Therefore, at the time of the permanency review, excluding the time the minor child was returned to the natural mother, the minor child was in placement for a total of fifteen (15) out of the last twenty-two (22) months.

15

The Pennsylvania Superior Court relied upon the Adoption and Safe Families Act (ASFA) in *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010). The goal of ASFA was described as follows:

> Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

*Id.* at 1119-1120 citing *In re G.P.*, 851 A.2d 967, 975-976 (Pa. Super. 2004)

In reversing the trial court and terminating the natural parent's parental rights, the Superior Court held:

> "ASFA-related policies now demand reasonable efforts within a reasonable time to remedy parental incapacity. Z.P. has already been in foster care for the first two years of his life, and his need for permanency should not be suspended, where there is little rational prospect of timely reunification."

*Id.* at 1125-26.

The Court finds that although reasonable efforts may have been attempted to reestablish the biological relationship between the natural parents and B.D., the Court finds no evidence which indicates that there is little rational prospect of timely reunification in light of the limited "in person" visits that he had with the minor child due to Covid-19 restrictions. Video calls with a child of such young age cannot replace the substance and benefit that Father can appreciate by personal contact with his child. All remaining services ordered for Father were completed, thus evidencing his intention to remain a parent and does not evidence a settled purpose of relinquishing parental claim and control to B.D. Assuming *arguendo* that Father wishes the Maternal Grandmother to retain primary physical custody after the conclusion of the dependency

16

hearing, reunification with B.D. is still achieved through the retention of parental rights and partial physical custody rights.

## VI. CONCLUSION

In conclusion, this court finds that Children and Youth did not meet its burden by clear and convincing evidence that Father's parental rights should be terminated pursuant to 23 Pa. C.S.A. Section 2511(a)(1) and 23 Pa.C.S.A. Section 2511 (a)(2). Furthermore, this court finds that Children and Youth did not present sufficient evidence indicating that there is little rational prospect of timely reunification between Father and child.

Respectfully submitted,

BY THE COURT

_____ J.
JENNIFER L. ROGERS

DATE: 5/27/4

COPIES TO:

CHRISTOPHER HARRISON, ESQUIRE
Luzerne County Children and Youth
110 N. Penna Blvd.
Wilkes-Barre, PA 18702

JOHN R. WILLIAMS, JR., ESQUIRE
Minora Krowiak Munley
700 Vine Street
Scranton, PA 18510

MARIA M. TURETSKY, ESQUIRE
105 Winchester Way
Scranton, PA 18504

17